Thank you for joining us on this special edition of ViiV Healthcare Co. v. Lupin Ltd. There really wasn't any significant dispute about that. The reason the district court did not draw the inference that a skilled artisan would expect the combination of drugs to do what they did individually was that, he said, they would be worried about cross-resistance. And cross-resistance matters because it would lead, in the view of the district court, to an expectation that resistance would come sooner than it would with the AZT-3PC combination. The court couldn't have been clearer. Are you disputing his fact-finding when he says it's clear that the art of HIV treatment was littered with failures as of March of 1995? Are you saying that he is evaluating failures as something only, it's only a success if it would work longer term? That in fact, the facts don't support that these things were failures, they support the fact that they don't have success long over time? Yes. Is that your point? That is exactly my point. And that is a good indication of where the district court's reasoning led up to legal error and not factual. You can accept the fact that AZT-3TC appeared at the relevant time to have sustained efficacy longer than the previous one. But monotherapies were still being used. And that's actually important because one of the things that the trial court found is that some two-drug combinations worked for a while and others didn't seem to work very well at all and certainly didn't work better than certain monotherapies. So, I mean, what the trial court did was find that this whole two-drug combination therapy was in a state of flux. Sometimes it was good, sometimes it wasn't good. Made those factual findings. Your Honor, I think this is another place where I think the district court made a clear error of fact. In fact, all of the prior discussion of combinations of NRTIs, the drug category in which these drugs came from, said that they were all synergistic or additive to synergistic. The court said that there was one combination that was antagonistic. In other words, they combined and made things worse. But the only evidence of that was from the lab notebooks of one of the inventors, which is not prior art. The prior art consistently taught that these combinations would generally be better, be more effective than monotherapies. Most of the combinations that were reported in the prior art showed that they delayed resistance longer than monotherapies, not as long as AZT3TC, but sustained it. This was a time when physicians were prescribing drugs to hold off resistance, to hold off AIDS, and drugs that did that even for a time, even for a period of months, were considered effective and important. You are in your time, so why don't we hear from Ms. Nsochi? Hi, good morning. Deanne Nsochi, on behalf of the League of Lupin Defendants. I'm going to try to not repeat what Teva said, because we obviously have some of the same concerns about the legal analysis that the district court performed, in terms of making it too high of a standard on expectations of success and criteria that could be identified as problems that needed to be solved. But in the context of the triple combination, here again, the district court's fact findings, many of them, we think, actually support the ultimate conclusion of non-obviousness. Right, and he said that. Right, exactly. And the findings that he offered, that AZT3TC was the best combination, that ABC was ripe for use in combination therapy, it was known to be an up-and-coming anti-HIV drug that had some better side effects, better improved bioavailability, those facts are reasons to combine them into the triple combination. So where did he go astray? I think he went astray in the sense that he said, for example, well, there were instances where you had a triple NRTI combination, AZT3TC and DDI, which was an already FDA-approved drug. He said, well, the clinical results weren't in on that yet, so how can that inspire imitation? Well, that's not really the standard in terms of teaching suggestion motivation or having a reason to combine. The district court simultaneously made fact findings that abacavir was a recognized improvement over DDI. Smaller pill burden, it had synergy with AZT, it was more potent, it had fewer side effects. So the clinical trial didn't have to have results in to be a guarantee of success in order for the person of ordinary skill in the art to be motivated to use ABC within that combination. He credited Dr. Ho's testimony that one of the skill in the art wouldn't be motivated to make the combination because they wouldn't believe that combination could possibly outperform AZT3TC, so they wouldn't be motivated to do it. And that's the error of law because when it comes to the actual claims that are asserted here, the triple combination claims and even the double combination claims don't provide any comparative efficacy parameters. If the claims had said a method for treating whereby this triple combination achieves efficacy superior to AZT3TC… It would be efficacy, but wouldn't they be concerned about toxicity, dumping all these drugs into an immune-suppressed patient? No, in fact… Isn't that what the record shows? No, in fact, quite the opposite. The record showed that you had a combination of AZT3TC and DDI, and the judge found that abacavir was going to be a less toxic NRDI. Right, but because of the cross-resistance, he said there would be no motivation to combine it. For the ABC3TC, but when it comes to abacavir, it actually includes the same mutation that resensitizes the combination back to AZT, so that doesn't… And you're saying that he made a factual error? And that one of the mutations, not only the M184, but the L75V, that both of those mutations that ABC produced resensitized back to AZT? Right, but the cross-resistance with the 3TC was an issue that he was concerned about. For the double combination, but for the triple combination, when you're putting AZT back in it, then it works. And again, it gets back to, first of all, not only what is claimed, because the 191 patent doesn't claim a combination that avoids cross-resistance or that comparatively avoids cross-resistance. Cross-resistance is not a problem that the 191 patent purports to solve. And that's a problem, because under Merck v. Teva and Alcon v. Abatex, which actually this entire panel was on, the fact that you might have some generalized safety concerns that are not resolved by the patent specification, that's not a valid problem that you could be focusing on. Same thing with the Merck v. Teva Alendronate case. No, but that all goes very much to whether one of skill in the art would be motivated to make that combination. But the person of ordinary skill, what you're basically saying is that because of this problem, the person of ordinary skill in the art would be skeptical that the combination would work. And in Merck v. Teva, this court specifically said, no, no, no, you can't do that. If the patent itself doesn't try to solve the problem, you can't say that that represents skepticism. Because Merck tried to make the same argument in Merck v. Teva. But the trial court didn't make a skepticism finding. The trial court specifically found against the patent holder on the skepticism issue. So you're mixing apples and oranges here. What the trial court was saying is that there's got to be some motivation to put these things together. And you rely on very limited things. You rely on abstracts, two little abstracts, which is kind of funny about whether you can rely on abstracts or not. But aren't all abstracts little? Yeah, yeah, yeah. But two abstracts and the larger application, which is very generalized and has a huge number of combinations. So that's what the trial court was trying to say is, is there enough in there to motivate someone to take a particular combination and put them together? Skepticism was not the issue. We found it in your favor on skepticism. But I think that this idea that there's somehow a problem out there that could discourage the motivation to do the combination. We have the motivation to do the combination because the bacteria is a new up-and-coming NRTI. He said that doctors would be willing to try anything as long as there wasn't a reason against it. And he also found that this was a more potent drug that solved some of the problems with the existing NRTIs that were, in fact, already used in a triple combination. Both DDI as well as Carbavir in the larger application. We also have the question of even if in the abstract you wanted to create a triple combination, AZT3TC is the best one to start with. And then if you want to add in a third because you want to hit hard, hit early, and he recognized that principle, then what drug are you going to use? You're going to use one of the very few drugs that is actually in human clinical trials that's being touted, which was Abacavir. Because that's the one drug that was out there that in that triple combination… You said the one drug. There were lots of drugs out there. Lots of drugs. And that was his point. Not recommended. And he's saying among those lots of drugs, am I going to pick the one that has the cross-resistance problem? But that's the problem is that if you want to start talking about I want to rule out something based on cross-resistance, all the other drugs in the other classes, they had equal if not worse issues with cross-resistance. None of them had been shown to work in combination to avoid cross-resistance. That was true with Nivirapine, that was true with Loveride, that was true with… I don't understand how that helps you. The fact that people tried things that might not have been viewed at the outset of potentially being successful doesn't mean they would have tried this thing. No, but the reason why they… my point is that you can't… if you want to say here's all these other drugs that I'm going to put on the table and then I'm not… but I want to consider cross-resistance as my preeminent thing, even though cross-resistance and achieving avoiding cross-resistance is not something that's claimed and not something that you need to achieve in order to have reasonable expectations of success to achieve what is claimed, that's still not a reason to say I won't pursue it. The Mercovich Biopraft case, there were 1,200 possible combinations. And the particular one that was selected out of it was still viewed as being obvious. But in your case, I mean, Abacavir wasn't even mentioned in Larder. I mean, you have to then jump another step and say, well, they would have picked Cavivir, is that how you pronounce it? Yes. Out of Larder, and then you would have found an analog that they would have taken another step. So, I mean, you're really taking us far down the road. No, I disagree with that because the Larder patent said I hereby include this category of certain types of NRTI categories. To specifically exemplify one of those, he identified Cavivir. It was undisputed below that Abacavir and Cavivir metabolize to produce the identical compound that actually does the therapeutic work in vivo. Abacavir, the district court found, was specifically designed to avoid toxicity problems that were associated with Cavivir. So it's natural for the person of ordinary skill in the arts to say, if I see this triple combination that's got Cavivir, the obvious choice to improve upon it is to use Abacavir because Abacavir was specifically designed to resolve known problems with Cavivir. One quick question. Does this actually matter to your client? Your client was found not to infringe, right? Not to infringe. So you decide to cross-appeal the blue brief on obviousness. I get it. There's lots of tactical reasons you may decide to do that, but your client won. I understand that, but Ziv is also asserting the same patent against my client in another… In the district court, but that's the same infringement. If we affirmed on non-infringement, that case would be over there, too, right? Your client wins either way if you prevail on the infringement. Is that true? You mentioned another case. Yes. The same claims? Yes. The same claims.  Thank you. Mr. Quinn. Mr. O'Quinn. I'm sorry. Thank you, Chief Judge Preston. May it please the Court. Just one clarification. The case that's pending in the district court involves the assertion of additional claims. So it's not… It wouldn't be… It doesn't involve just the claims that were issued in this case. But would the non-infringement finding here, if we upheld it, would that control in that case? Not with respect to all the claims that have been asserted in that case. That's my understanding, Judge O'Malley. Turning back to the issue of obviousness, and then I do want to come to the issue of infringement. The district court's finding of non-obviousness after a trial involving some 10 experts is well-grounded in the fact that Dr. Berry and Ms. St. Clair's discovery of the claimed pharmaceutical combinations was the product of their unique insight from their experience in this field for over a decade. Just to back up. When you say there are other claims asserted, you mean from a whole different unrelated patent, right? No. No, Judge Moore. There are other claims. From the same patent? The derivative claims? No, not… Some of them may be derivative claims, but there are claims that are asserted, independent claims that are asserted in the actions pending in the district court that are not the same as all of the claims that are asserted in this case, and I believe some of them are also independent claims that did not go to trial in this case. What's the status of that case? Well, there are claims that involve physiologically functional derivatives, and the status of that case is, I think it's relatively early in that case. When does this patent expire? This patent expires in March of 2016, and Judge O'Malley, some of the claims asserted in that case do involve physiologically functional derivatives. Those are more than just salt claims. Physiological functional derivatives contain things that are more than salt. They include esters, ethers, salts of esters, and indeed they give rise to things, not to jump ahead to the issue of infringement, but they give rise to things that create active ingredients different than the active ingredient of abacavir. So it's not the case that physiological functional derivatives all necessarily give you abacavir. Some of them give you metabolites of abacavir and don't go through the step of becoming abacavir, and that is why the district court fundamentally erred on the issue of infringement here. There are three separate reasons that the district court erred on infringement. One is the interpretation of the claims under this court's teaching in Merck v. Teva. Actually, it's a different Merck v. Teva case than my colleague was discussing. Second is that regardless of how the claims are actually construed, there's no factual dispute that the method claims would actually be infringed, and that's because a patient is in fact treated with abacavir-free baits because abacavir sulfate immediately dissolves into abacavir, and the patient is in fact therefore treated with abacavir-free baits. That's not disputed. Lupin's expert Dr. Arnold at Appendix 441 testified that Lupin's product, quote, provides abacavir. That is the active ingredient. Otherwise, the product won't work, end quote. Indeed, if you look at the label on Lupin's product at A5782, it says, quote, in vivo abacavir sulfate disassociates to its free base abacavir, and for that reason, the dosages on the labels themselves are in terms of abacavir as opposed to abacavir sulfate. And in these 5812, the label refers to abacavir as being the active ingredient. And so what you have is a situation where all of the elements for method claims and 39 are literally met even if the abacavir chemical formula term were construed as just encompassing abacavir-free baits and not also encompassing abacavir sulfate. And the reason for that is because abacavir sulfate is, the patient is treated with abacavir sulfate because it disassociates into it. The patient is treated with AZT, and the patient is treated with 3TC. And if you look at the elements for claims 30 and 39, that's all that they require. The district court didn't actually really grapple with this particular issue of non-infringement. I'd like to move to obviousness. I'd be happy to, Judge Moore. AZT and 3TC was the gold standard. I don't remember where, but somewhere in the opinion that was what he found, right? I don't know if he used those words, but I'm sure those words were used at trial, Judge Moore. Pat Page, 50 of his opinion, 855 of the record, actually. It says AZT, 3TC was known as the gold standard of HIV treatment in March of 1995. So I think I'll treat that as a fact finding. So if that's the gold standard that everyone's using, yet it's still wearing off, and it's not, I mean, certainly not solving all the problems, and doctors are still out there repeatedly and often trying other combinations to see if they can get a little more out of the effectiveness. Why wouldn't, can I call it ABC, is that? Sure, abacavir is sometimes referred to as ABC. Okay, well, yes, all the acronyms are tough, but so are the words for me. Okay, abacavir. So why wouldn't it have been obvious that abacavir had been one of the other chemicals that had been used in monotherapy to just sort of, I mean, it seemed like a bit of a free-for-all from a medical standpoint in terms of, okay, here are a bunch of things. As monotherapists, they're, it's a little effective but not good for this, it's a little effective but not good, and then they're mushing things together. I mean, it seemed like a Wild West sort of approach to combining things. Why would it not have been obvious to add abacavir to what is the gold standard? Well, Judge Moore, first, if you're looking at this through the analysis of an obvious, an obvious to try analysis, you're dealing with a world where there were hundreds, if not thousands of possible combinations that a person of ordinary skill and heart would potentially be exploring. And this court has repeatedly suggested that when you're in the medical arts and the chemical arts, the obvious to try analysis typically doesn't fit because you can't predict how things are going to behave, and that's exactly what the case was, that yes, it's true, different combinations were being tried. But there were only 28 drugs in clinical trials, and abacavir was one of them. So while theoretically there might be thousands, truthfully, we're talking about a universe of 28 at this point in time. No, we're not, Judge Moore. Emphatically, we are not. And in fact, if you look at what the defendant's own experts testified about, Dr. Arnold and Dr. Parniak both were asked, because they were working in this field at the time, what do you do? What were you doing then? And what they were doing, they were working with a number of different types of compounds, NNRTIs, protease inhibitors, and Dr. Parniak was specifically asked and specifically testified he was working with drugs that not only were not in clinical trials, they hadn't even been tried in animal studies. The idea that a person of ordinary skill in the arts would have... Well, that's troubling for a whole different set of reasons. I don't think that necessarily gets you to the lack of motivation to combine. What it does, Judge Moore, is it gets you that you're not in a universe of 28 drugs, and you're not in a universe where the spotlight should be appropriately shined on abacavir. The only reason to focus on abacavir today is through the rubric of hindsight. At that time, in March of 1995, there were no clinical results with respect to abacavir. It's true that it was a trial. But it was identified. There were only 28 clinical trials that were going on at that time, which is actually a lot, so I shouldn't say only. But there are 28 clinical trials that are going on, and that is one of the 28 of the millions of possible drugs. Obviously, somebody thought that one had enough potential at that time. I mean, clinical trials are not cheap. A lot of oversight. I mean, somebody thought that was one of the most promising possibilities. Judge Moore, the inventors had identified abacavir as being a promising possibility. The quote that the defendants rely on comes from an abstract that Ms. St. Clair herself was one of the authors of. I mean, yes, the inventors in this case who also, Ms. St. Clair was involved in identifying the activity specifically of AZT, specifically the activity of abacavir, and early studies with 3TC itself, and that was the insight that she was able to bring to bear here. Yes, she had identified abacavir as being something for further study. And the reason that the district court found that is because the district court was rejecting the argument that someone would completely exclude abacavir, that you wouldn't consider abacavir at all, and was saying no, it was something that you would consider trying, like you would consider trying a lot of other things. But the point is the district court rejected the notion that this is a world that was limited to 28 drugs that were in clinical trials, and even if you're talking about 28, you're talking about different dosages, different formulations, different delivery, so you're not talking about a narrow universe. But then on top of that... But I didn't think that's what we were really disputing, these particular claims, was the dosage level made it non-obvious, or the formulation. I thought it was the combination of these three drugs that was really the heart of what we're trying to figure out on that one. My point, Judge Moore, is that the fact that you have certain drugs that are out there in clinical trials doesn't mean that you're in a universe of obvious to try, because there are lots of different trials that would then have to follow, even if you were starting with those 28. But on top of that, you have specific testimony that the district court credited from Dr. Ho, this is at A1443 to A1444, on why a person of ordinary skill in the art wouldn't have been motivated to take the AZT, 3TC combination and add a back of ear to it. He said, quote, If you're going to build on AZT and 3TC at that time, certainly it's more logical to use the PIs, the protease inhibitors, and the NNRTIs, because they were further along with the clinical data and showing a great deal of potency in patients. And then on top of that, Dr. Ho also testified about concerns with toxicity with triple NRTI combinations at A1440. But the court found that the toxicity wouldn't be as high with ABC as it was with carbonate. I'm not going to say it right, because I know that's not whatever. Carbonate. Yeah, okay. But he made an express finding that toxicity wouldn't be as much of a concern with ABC. With respect to that one in particular, Dr. Ho did talk about that there was a risk of synergistic toxicity between AZT and a back of ear. In part, that risk came out of concerns over carb of ear. But separate and apart from that, Dr. Ho testified at A1440, quote, There was a lot of concern that we might be doing too much chain termination for normal DNA, and by and large people avoided the combination of a triple NRTI in part for that reason. So as between two triple NRTIs, a back of ear might have been a little bit better. But as between triple NRTIs and other combinations, that's what the district court was focusing on, right? Right. In other words, so you have two drugs here. One is a double combination of a back of ear and 3TC. That runs headlong into concerns about cross resistance. It was well known that both a back of ear and a 3TC selected for that has resulted in the same primary mutation, the M184V mutation. And it was also well known that the M184V mutation basically rendered 3TC almost immediately ineffective. And so the idea that you would start with 3TC or start with a back of ear and think to put the two of them together is entirely built out of hindsight. And then with respect to whether you would take AZT and 3TC and then add to it a back of ear, there was only one example in the prior art, two abstracts, one of which came from the inventors, of any triple NRTI combination. That was the one involving DDI. It wasn't as though there was some particular reason. The art didn't say, you should explore triple NRTI combinations for this reason and there is a reason to then go back in and take DDI out and put a back of ear in. That's constructed completely out of hindsight. And in fact, what you have is the opposite, and this is the testimony from Dr. Ho, that in general there would be a desire to avoid triple NRTI combinations because what that does is it stops the normal functioning of DNA. And instead what a person of ordinary skill in the art would have been motivated to do is exactly what Dr. Ho did, which is to look at other classes of compounds. The NRTIs are functional, look at one step in how HIV replicates within the human body. There are a lot of other different steps. And what made sense is to take a backbone and then add other things to it. And that's exactly what Dr. Ho successfully pursued separately in a different direction. Now you wanted to reserve some of your time for rebuttal on the Cross-Appeal. That's up to you. I did. I believe the talk started at 18, but I'm happy if the court has... Oh, I'm sorry. You're right. I apologize. If the court has no further questions with respect to obviousness or any of the other issues that were raised in the appeal, I'm happy to rest and reserve the balance of my time for rebuttal that would only be on the issue of infringement. But if there are other questions on the issue of obviousness or anything else, I'd be happy to address those. Okay. Thank you, Your Honor. Please, the court. I'm just going to make a couple of quick points because I don't have much time. First of all, abacavir was not just another drug. If you look at the district court's opinion in pages 31 and 33 of the appendix, it identifies all of the reasons why abacavir was not just another drug but was at the top of the list. But there is this important point about the difference between just three NRTIs and the two NRTIs. I mean, the toxicity is... This isn't just a minor level of toxicity. We're talking about, you know, making people severely ill and anemic and gastrointestinal problems and everything else, right? That cuts, I suggest, the other way, Your Honor, because one of the principal motivations... The judge found that no one in their right mind would break up the combination of AZT, 3TC and substitute abacavir for the AZT. That's simply wrong. I mean, there was a clear motivation. The biggest problem with AZT, 3TC is that there was a substantial subpopulation of patients who could not take it or would not take it. Right, but you made specific findings of fact and credibility determinations on that issue. I mean, you've got a huge uphill climb. I don't think there was any dispute that that was a problem, that toxicity was a problem with the AZT, 3TC combination. Well, of course not. But the prior art was also quite clear that abacavir was not nearly as toxic as AZT. But the problem is if you take out the AZT and you just combine it with 3TC, that's when you have the cross-resistance and other toxicity issues. Cross-resistance is not a toxicity issue, Your Honor. Cross-resistance is an issue that deals with how long the judge will suppress HIV reproduction before resistance strains of HIV emerge that are unaffected by the drug. The cross-resistance problem is that as the district judge thought of it, was that a person of skill in the art would be concerned that the abacavir-3TC combination would not suppress viral reproduction as long as, for as long a period of time, as the AZT-3TC combination. There is no doubt that it would be less toxic. So, thank you. Let me address just a couple of quick things on obviousness and then I'll jump into the non-infringement. Could you first say, was he correct? I asked you if the district court litigation, as to your client, would be entirely resolved if we were affirming on non-infringement here. Is he correct that it's not the case that it would be? I don't know whether they're going to continue to assert all the claims at trial that they did. In this case, presumably if they decide to assert more claims, even if they're invalidated, even if we find non-infringement here, that's still going to create a separate set of claims. Now, are there claims asserted in the other litigation to which the non-infringement decision here would not apply? I believe there are. And how could there be a second lawsuit without an argument that the cause of action was split? I mean, I'm not prepared today to talk about issues of potential claim preclusion or collateral estoppel, but I do know that one of the reasons why we chose to file this cross-appeal on the invalidity issues is because we want to ensure that we are not prejudiced in the follow-on litigation. I mean, again, there's an IPR pending against this patent. Obviously, if that is resolved to invalidate the patent, that's going to impact the other litigation too, but we're not... Go ahead. Get on to your rebuttal. Now, I did want to say that for Dr. Ho, Dr. Ho's testimony about why he thought you would want to use as a third drug the protease inhibitors, he specifically said that he was basing that on his own personal experience within his lab where he had access to all kinds of non-public data regarding the protease inhibitors, and he conceded, and we put the sites in our brief, that that was not disclosed until 1996. So that teaching about the protease inhibitors cannot serve as a valid motivation teaching when we're looking at the relevant March 1995 time period here. Further, Dr. Ho also admitted, and this is at A1513, contrary to counsel's representation, he acknowledged that doctors had been prescribing triple NRTI combinations before. In the DDI. No, separate and apart from the DDI combination in the clinical trials. They had combined AZT, DDC, and DDI. So doctors had, in fact, done triple NRTI combinations, notwithstanding all of these existing cross-resistant concerns and what have you. And I would also like to note that the abstract, small though it may be, it did actually say that the AZT, 3TC, DDI combination when it was tested in vitro was actually one of the most potent combinations, particularly when given to patients early. So then what did they do? They then went into clinical trials and started giving it to children who were early on in the disease. So I think that the person of ordinary skill in the art can actually learn quite a lot from those two abstracts about why this is happening. You've got the AZT, 3TC combination. You see what was done with the FDA-approved drug on the market, DDI, how they added it to the combination. So you know that abacavir is also synergistic with AZT in that it's got some properties that are better than DDI. That's a reason to include it in the combination. But from that, you'd have to actually change two drugs from what was described in the abstract, correct? No, just one. Just one. You would take the DDI, which was already on the market, and because abacavir was known to perform, have attributes that were better than DDI, that would be the one that you would substitute. You would preserve the very successful AZT, 3TC combination and then say, all right, but DDI, it has some known drawbacks. But the district court made fact findings about cross-resistance, and whether I agree with you or not, I have got to go give those clear errors deference. I mean, maybe you're right. Maybe, you know, oh, well, you know, my juvenile understanding of the complexity of this technology, DDI and ABC, aren't that different from each other in lots of relevant respects. However, the district court said cross-resistance was a problem. People were concerned about it. Those were his fact findings. How can I just disregard them because there happened to be a single or two single abstracts that proposed a three-drug combination like that? Well, there was also physicians who had done the three-drug combination. They'd actually prescribed it. Yes, but he made a fact finding that people skilled in the art were worried about cross-resistance, and that's why they wouldn't do this. And yes, there is some limited evidence of some people doing it, but even the fact finding, I can't say, how do I say it's clearly erroneous? Because it's not teaching away. The fact that there might be some cross-resistance doesn't automatically mean that the triple-drug combination is not going to achieve what is actually claimed, which is reducing the amount of HIV in the bloodstream. That's the key distinction. But he didn't say it was teaching away. What he said is you have the burden of proving that there is a motivation that exists in the prior art. It's not just a simple question of whether or not people were willing to take crapshoots. You have to actually say, was there a motivation that you can point to in the prior art that would make this obvious and that would provide a motivation to combine? And the trial court found that there was. No, I disagree. The trial court found that there were reasons to include ABC in a combination. When he started focusing on cross-resistance, what he's basically doing is he's putting himself in the mindset of the inventors and saying, well, what were the inventors interested in? They were interested in cross-resistance, so I'm going to impute that to the person of ordinary skill and art. And then he said the question is not whether there is any motivation to put any particular drug into a combination generally, but is there a motivation to put this drug in this combination? I understand that. And the problem is that when it comes to cross-resistance, that should not be a discouraging factor that can counter motivation because the 191 patent itself doesn't solve the cross-resistance problem. If you want to basically say that cross-resistance is the end-all, be-all that's going to allow a person of ordinary skill and the art to credibly believe that this combination is going to work, then the 191 patent claims themselves have to fall as non-enabled because they don't express a credible utility. I mean, that's the fundamental problem. The 191 patent doesn't solve the problem and this court's precedent that we've cited is clear that you can't argue against a motivation based on a problem that the patent itself doesn't pretend to solve over the prior art. If I may, let me turn briefly to the non-infringement issues. First, I did want... Oh, I'm sorry, and there actually was testimony in the record, I will find it, where Dr. Blick actually testified that he prescribed drugs even though they were cross-resistant and that cross-resistance would not factor into his prescribing decisions. Now, when it comes to the cross-appeal on claim construction, the district court specifically stated, and this is at 821, that our expert, Dr. Arnold, persuasively explained how the salt form is chemically distinct from the pure or free-based form of the Bacovir, that the court cannot find that persons skilled in the art would have understood the pure or free-based form of the Bacovir to be the same thing as or to encompass the salt form. Those are findings of fact and they do deference here. On the literal infringement question, we dispute plaintiff's characterization Are they findings of fact relating to claim construction? Is that your view on this? I think that he made a finding of fact that the person of ordinary skill in the art would not view the 1S methanol chemical language as encompassing salt. And that's exactly what takes this case out of the realm of Merck v. Teva, it takes it out of the realm of the Stevens case that plaintiffs cited in their reply brief. He found the person of ordinary skill in the art would not view the chemical nomenclature in the claims to implicitly include the salt and that's entitled to deference here, particularly in view of the recent Supreme Court Teva decision. Now when it comes to the literal infringement issue, the district court likewise found that the Bacovir free-based was not still in there, in the salt, but it had been chemically modified in a way that took it outside the claims. Now when plaintiffs say, oh, but somebody admitted that in vivo you can actually destroy the sulfate salt and get a Bacovir free-based before it gets metabolized to carbovir triphosphate, that is fundamentally irrelevant because these claims that are at issue here have more in them than just here is a Bacovir being used in a patient. What these claims require are all kinds of additional elements relating to being in a combination with either one other drug or two other drugs being administered as a unit dose, etc. And the plaintiffs did not separately post out their method claims this way. So when it comes to each and every element being infringed, when it comes to what's going on inside the body, they never tried to show each and every element of their claims was satisfied when you were in vivo. And that's a fundamental failure proof. They didn't even try to prove that at the district court. We'll conclude your argument way over time. Mr. O'Quinn, for final statements, just on the non-infringement issues, the subject of your cross-examination. Yes, Chief Judge Gross, thank you. First, Judge O'Malley, in answer to your question, the reason there's another lawsuit is they filed another ANDO with respect to a different drug, and this patent is asserted with respect to that drug. Turning to the issue of infringement, again, there are three independent reasons why Lupin's product infringes. The first is that the method claims, what my colleague was just talking about, the method claims all of the elements are met when a patient is treated with Lupin's product. They're all literally met. However, the chemical formula term for abacavir is construed, whether it's construed as just being the free base or it's construed, as we think it should be, as encompassing the salt forms as well. Either way, they're all construed. My colleague made points about, well, there are other things that haven't been proved up. Respectfully, that's just not true with respect to method claims 30 and 39. If you look at method claims 30 and 39, they depend on independent claims 20 and 32, and what does it say? A method for the treatment or prevention of the symptoms or effects of an HIV infection in an infected animal treating said animal with a therapeutically effective amount of a combination comprising abacavir, and one of them is abacavir in 3TC and the other is abacavir AVT in 3TC. And what all the claims 30 and 39 add to the independent claim is that said animal is a human. And you have other dependent claims that show it doesn't matter the sequence in which they're administered. So if you look at claims 27, 28, 29, 27 talks about simultaneous, 28 talks about sequential, 29 talks about a single combined formulation, but that is a subset of what's covered by independent claims 20 and its counterpart 32, and the only thing that dependent claims 30 and 39 add, which are asserted here, is that it'd be a human, and there's no dispute about that. So there's no dispute that the drugs are all, that a person, a patient, a human, is treated with abacavir free phase, and not as just some person testified, but they're experts on non-infringement. Dr. Arnold specifically testified, quote, that Lupin's product provides abacavir. That is the active ingredient, otherwise it wouldn't work. And that leads me directly into the issue of infringement under the doctrine of equivalence, because even if for some reason there was some reason not to find that there's literal infringement of the method claims, this is clearly a case that falls within the doctrine of equivalence. And Dr. Langer, our expert, explained that abacavir sulfate is used like abacavir to treat HIV symptoms the same way by delivering the same active ingredient, abacavir, to inhibit HIV replication in the same way. That's at A351 to 356. That's the function way result test every time. And the only responses to that that were offered either by the district court or by Lupin are, well, you don't know that it necessarily has the same handling properties. That's not relevant to the claims that are asserted, and it's certainly not relevant to the asserted method claims. Or to suggest that there should be some per se rule against applying the doctrine of equivalence this way because there are other claims that could have been asserted that might also cover these things as well. Let me ask you about that. So why didn't you assert the claims that specifically reference the salt derivative? Judge O'Malley, I'm not privy to that. I mean, trial's about choices, about narrowing things down, and the parties narrowed a number of things and dropped offenses and dropped claims as well. And as the claims were being dropped, the claims that were asserted were the ones that were being asserted. You can understand the trial court's concern. So you've got a patent, and maybe the patent has five claims. You choose to assert one, and when you lose on infringement on that one, you say, well, under DOE, we can get what could have been asserted under Claim 3. But Judge O'Malley, that concern would come up in every single case. I mean, that would create a prospect where a party would essentially run the risk if you don't assert all of the claims in your patent, then you're going to lose scope of DOE that you would otherwise have. That is inconsistent with the Graber-Tank decision itself, and this court walked through that in Johnson & Johnson, where you had claims that would have been literally infringed, except it turns out those were invalidated. It's not just that they weren't asserted, they were invalidated. And later the Supreme Court held that the claims that remained, that were asserted, would capture that scope under the Doctrine of Equivalence. And this court has recognized in a number of cases, multi-form desiccants, 133 F. 3rd at 1480, that, quote, claims that are written in different words may ultimately cover substantially the same subject matter. Claims are looked at, they rise and fall independently, both for infringement purposes and for invalidity purposes. And so to go the way that the district court did would need to be making a policy choice. And that is exactly what the Supreme Court has reiterated in Warner-Jenkins and Fesso, that the courts are not supposed to be doing with respect to the Doctrine of Equivalence. And to come up with some sort of a per se rule here, I think would A, be inconsistent with that, and B, I think it would create bad incentives in district court and make it hard for parties to narrow the claims that are being asserted without running the risk of exactly what you were just talking about, Judge O'Malley. But in any event, we think this is also a straightforward case for literal infringement, precisely because there can't be any serious dispute that all three of the claimed elements are what a patient is treated with. I mean, it's right there on their own label. I mean, you ask why might you have narrowed some claims, I mean, you look at the label, A85782, in vivo abacavir sulfate disassociates to its free base abacavir. No dispute over that. And then finally, and the court certainly doesn't have to reach this in order to reverse with respect to the method claims, but we also have the argument that in fact the chemical formula term abacavir appearing in the claims would be construed by a person of ordinary skill in the art as encompassing the salt forms as well, just as this court held in Merck versus Teva. And the only argument that my colleague makes to the contrary is to say, well, there's testimony that a person of ordinary skill in the art understood these were different chemical formulas, that they're different chemicals, different chemical weights, and so forth. That's not disputed, and it's also not relevant. And in fact, this court in Merck versus Teva specifically rejected that kind of argument, that kind of reasoning, saying the question is not whether a person of ordinary skill in the art would understand whether they're different chemicals, the question is whether they would understand in the context of the claims, in the context that they're written, that by using it, you meant to encompass the active ingredient however it was administered, whether in its free base or free acid or salt form. If the court has further questions, I'm happy to take those. Otherwise, thank you very much. Thank you.